UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
THE NEW YORK DISTRICT COUNCIL OF
CARPENTERS PENSION FUND, NEW YORK CITY
DISTRICT COUNCIL OF CARPENTERS WELFARE
FUND, NEW YORK CITY DISTRICT COUNCIL OF
CARPENTERS VACATION FUND, NEW YORK
CITY DISTRICT COUNCIL OF CARPENTERS
ANNUITY FUND, NEW YORK CITY DISTRICT
COUNCIL OF CARPENTERS APPRENTICESHIP,
JOURNEYMAN RETRAINING, EDUCATIONAL
AND INDUSTRY FUND, NEW YORK CITY
DISTRICT COUNCIL OF CARPENTERS CHARITY          07-CV-08008 (RJS)
FUND, by their Trustees Michael J. Forde and Paul
O'Brien, and NEW YORK CITY AND VICINITY
CARPENTERS LABOR-MANAGEMENT
CORPORATION,

                              Plaintiffs,

        -against-

KW CONSTRUCTION INC., as Successor to K W
GENERAL CONTRACTOR, INC. and JOHN WHYTE
d/b/a KW CONSTRUCTION, INC.,  and JOHN
WHYTE, individually,

                              Defendants.
-------------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR AN ORDER OF ATTACHMENT AND TEMPORARY RESTRAINING ORDER

        This memorandum of law is submitted on behalf of plaintiffs, (hereinafter, "the Funds")

in support of their motion for an order of attachment pursuant to Federal Rule of Civil Procedure

64 and New York CPLR § 6201.

## PRELIMINARY STATEMENT

Plaintiffs brought this action to recover a principal sum of $1,114,185.18[1] in pension and other fringe benefit fund contributions owed to them by defendants. Plaintiffs now move for an order of attachment against the property of defendant John Whyte ("Whyte") in order to secure the judgment that will inevitably result in this action. While the flow of money and other assets through a web of individuals and sham corporations described below is rather circuitous, the basic facts of this case are quite simple: defendant Whyte defrauded the plaintiffs out of a large sum of money and proceeded to engage in a number of fraudulent transactions to hide that money and to evade the collection of his debt. Given defendant Whyte's long history of fraudulently transferring and otherwise encumbering his assets in response to attempts by the plaintiff Funds to recover the money they are owed, as described below, it is reasonably certain that if an order of attachment is not issued, any judgment that will result from this action will be worthless.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant KW Construction Inc. ("KW") was, at all relevant times, signatory to a collective bargaining agreement ("the CBA" or "the Agreement") with the District Council for New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("the Union"). A copy of the CBA effective from July 1, 2001 to June 30, 2006 ("the 2001 Agreement") is attached to the Declaration of Nicholas Hanlon ("the Hanlon Declaration") as Exhibit 1. A copy of the CBA effective from July 1, 1996 to June 30, 2001 ("the 1996 Agreement") is attached to the Hanlon Declaration as Exhibit 2, and copy of the "Interim

---

[1] This principal sum is based on a preliminary assessment which may be modified pending further discovery, and in any event does not include interest, liquidated damages, attorneys' fees and costs, all mandated under ERISA.

Compliance Agreement" through which KW undertook to extend the term of the 1996

Agreement and to obligate itself under the 2001 Agreement, is attached to the Hanlon

Declaration as Exhibit 3. KW and its predecessor, KW General Contractor, were signatory to

prior collective bargaining agreements with the Union since at least 1991. These CBAs

uniformly required KW to make contributions to various trust funds for each hour worked by

carpenters performing covered work. Said trust funds are the plaintiffs in the instant action, and

they have been established to provide fringe benefits for Union members including a pension,

medical and hospitalization insurance, an annuity account, and vacation pay. The Funds are

jointly administered Taft-Hartley trusts, which means that they are governed by a board of

trustees, half of whom are appointed by the Union, and half of whom are appointed by the

employers who have collective bargaining relationships with the Union, in compliance with the

requirements of the Taft-Hartley Act. *See, Unique Woodworking, Inc. v. New York City Dist.*

*Council of Carpenters' Pension Fund*, 2007 WL 4267632, 1 (S.D.N.Y. 2007); 29 U.S.C. §

186(c)(5). The CBA provides that KW is bound by all the terms and conditions of the

Agreements and Declarations of Trust that establish and govern the Funds, as amended ("Trust

Agreements"), and by all by-laws adopted by the Trustees to regulate the operation of each of the

said Funds. The CBA also provides that KW is required to make available to the Funds its

pertinent books and records, including but not limited to its payroll records, cash disbursements

journal, general ledger, state and federal tax filings and check register, for the purposes of

conducting an audit to ensure compliance with the employer's contractual obligations. The

CBAs also provide, *inter alia*, for the submission of disputes to final, binding arbitration.

The parties have been involved in an auditing process, arbitration, and litigation since

2003. Briefly, in 2003 the Funds conducted a payroll audit of defendant KW Construction's

3

books and records pursuant to the authority granted to them in the CBA. The audit revealed that a sum in the neighborhood of two hundred thousand dollars was due and owing. Arbitration pursuant to the terms of the CBA was commenced, and an arbitration award was issued in favor of plaintiffs and against KW. A copy of the arbitration award is annexed to the Hanlon Declaration as Exhibit 4. The arbitration award was confirmed by Judge Koetl, and judgment was entered against KW on November 7, 2005 in the amount of $200,675.09 ("the 2005 Judgment"). During the course of supplemental proceedings to enforce the 2005 Judgment, it was discovered that the scope of defendant Whyte's fraud against the Funds was far greater than had previously been revealed by the payroll audit. The Funds retained the services of forensic auditor Gregory Polvere ("Polvere"), and he determined that approximately $1,114,185.18 was owed to the Funds above and beyond the liabilities included in the 2005 Judgment. *See,* Affidavit of Gregory Polvere ("Polvere Aff."), at ¶ 10, annexed to the Hanlon Declaration. Polvere also discovered that financial records that would have revealed KW's fraudulent scheme had been intentionally and fraudulently concealed from the payroll auditors. (Polvere Aff. at ¶¶ 15-17)

The CBA requires that fringe benefit fund contributions be remitted to the funds for each hour of covered carpentry work performed. The fraudulent scheme consisted of paying carpenters off the books, with non-payroll checks drawn on separate bank accounts that were intentionally concealed from the payroll auditors. (Polvere Aff. at ¶¶ 11-14) There is reason to believe that the financial activity conducted through these separate bank accounts was concealed from the IRS as well. (Polvere Aff. at ¶¶ 16-17) The $1,114,185.18 figure is a preliminary finding based on the analysis of only two of the bank accounts controlled by defendant Whyte discovered during supplemental proceedings. Sworn statements of the carpenters who both

participated in and were victimized by this fraudulent scheme further support the Funds'

allegations, and provide a partial description of how the scheme worked, as discussed below.

(See Affidavit of Bienvenido Rivera, annexed to the Hanlon Declaration as Exhibit 12).

During the course of the first audit, arbitration, and award confirmation processes, Whyte

systematically engaged in a scheme of transferring his assets to third parties – often for little or

no consideration – as part of an effort to render himself judgment proof.[2]  In order to achieve his

fraudulent purposes, Whyte set up a number of sham corporations, which, upon information and

belief, served no purpose other than nominally owning bank accounts, controlled by Whyte, and

which were used for KW's off-the-books payroll and fraudulent transfers, and to generally

obfuscate his finances and hide his assets.  While a good deal of Whyte's movement of money

and assets is untraceable, due to his heavy use of cash and money laundering schemes, a

significant amount of fraudulent activity is evidenced by the records from twelve personal and

business bank accounts that have been discovered by the Funds.

**Timeline of Litigation and the Movement of Whyte's Assets**

Below is a brief recitation of the dispute between the parties, a history of the litigation

and alternative dispute resolution mechanisms that have been pursued, as well as the

simultaneous efforts by Whyte to defraud his creditors and frustrate and hinder the enforcement

of any judgment that might be rendered in favor of plaintiffs by assigning, disposing of and

secreting his assets.  The timeline is highly relevant to this request for provisional relief as it

demonstrates the past and present efforts of defendant Whyte to frustrate the collection of his

---

[2] N.B., this is the third fraudulent scheme discussed.  The first was to avoid making the required benefit funds contributions by misrepresenting the hours worked by covered carpenters, the second was to conceal the fact the required contributions were not made from the Funds and their auditors, and the third was the effort by Whyte to render any judgment against him and in favor of the Funds ineffectual and unenforceable.

debts.  If such efforts are not stopped by the Court, they will render any judgment in favor of

plaintiffs ineffectual and unenforceable, thus causing irreparable harm.

- January 2003 – August 2003.  The Funds conducted a payroll audit of KW's books and records for the period of January 1, 2000 through June 30, 2003.  The audit revealed a delinquency in required fund contributions in the amount of $177,944.27.

- March 24, March 26, and April 14, 2004.  The Funds and their auditors send letters notifying KW of the delinquency uncovered by the audit, demanding payment, and advising that arbitration proceedings would be commenced if no payment was made.  A copy of the auditor's March 24, 2004 letter is annexed to the Hanlon Declaration as Exhibit 5.

- April 19, 2004.  The Funds serve a Notice of Intention to Arbitrate on defendant Whyte.  *See* Exhibit 4.

- May 2, 2004.  Defendant Whyte transfers $38,000 to a corporation that he owns and controls named "EMC" by a check drawn on the account of TWG of Tri State Inc. and signed by Whyte.  A copy of this check is annexed to the Hanlon Declaration as Exhibit 6.

- June 1, July 7, and August 27, 2004.  The first three of what would eventually be six arbitration hearings are held.  At each of these hearings, Whyte promises to produce financial records that are never produced.[3]  Exhibit 4.

- September 22, 2004.  Whyte transfers his interest in a property located at 17 Highland Avenue, Yonkers, New York to Michael Kennedy for no consideration.

---

[3] That is, they were never produced by Whyte.  After Plaintiffs obtained a judgment against Whyte, some of these records were produced pursuant to third-party subpoenas.

A copy of the deed and Westchester County Recording and Endorsement Page associated with this transaction is attached to the Hanlon Declaration as Exhibit 7.

- October 25, and November 17, 2004.  Whyte appears at arbitration hearings, and again promises to produce the financial records that are never produced.  At the November 17 hearing, the parties agree that Whyte will produce said financial records before the next arbitration hearing, which is scheduled for December 7, 2004, and this agreement is incorporated into an Arbitrator's Directive.  Exhibit 4.

- December 6, 2004.  John Whyte transfers to EMC of Tri State – a corporation that he controls – $462,000.00.[4]  Exhibit 8.

- December 7, 2004.  Whyte fails to appear at the scheduled hearing, and as such the documents he was ordered to produce are not produced.  Exhibit 4.  A default award is entered against KW Construction, a copy of which is delivered to Whyte.

- February 9, 2005.  The Funds, though counsel, advise Whyte that if he does not comply with the arbitration award, legal proceedings to confirm and enforce the award will be commenced.  Exhibit 9.

- March 7, 2005.  Whyte transfers his interest in properties located at 225 Millwood Road, Chappaqua, New York, and 652 Central Park Avenue, Yonkers, New York, to his wife, Nasheema Ramjohn, a.k.a., Nasheema Whyte for consideration of $10.00 each as part of a scheme to avoid paying his debts and obligations to the plaintiff Funds.  A copy of the recorded deeds and transfer tax statements

---

[4]  The check, dated December 3, 2004 and funds transferred out on December 6, 2004, bears the name of Nasheema Ramjohn, but Whyte became a joint owner of this account in May of 2004, at which point the average monthly balance jumped from about $13 to over $600k, and the check is signed by Whyte.

associated with these transactions are attached to the Hanlon Declaration as Exhibits 10 and 11, respectively.

- April 21, 2005.  The Funds commence an action in the U.S. District Court for the Southern District of New York to confirm the arbitration award.

- April 27, 2005.  A summons and a copy of the complaint in the above referenced action, 05-CV-4021, is served on KW.  Exhibit 13.

- July 30, 2005.  Whyte transfers $25,000 to "EMC New York Contracting" by a check drawn on the account of KW Construction of Tri State and signed by Whyte.  A copy of this check is annexed to the Hanlon Declaration as Exhibit 14.

- August 30, 2005.  Whyte transfers $40,000 to "EMC Contracting" by a check drawn on the account of KW Construction of Tri State, and signed by John Whyte.  Exhibit 15.

- October 28, 2005.  Whyte executes a sworn affidavit stating, among other things, that "KW provided the Plaintiffs with all books and records of the company relating to the period January 1, 2000 through June 30, 2003," and "I understand that the Plaintiffs are foregoing legal action to compel the production of this information based on this affidavit," and "I further understand that the Plaintiffs have conducted an audit of KW based on all available records from which findings have be [sic] made of delinquent benefit funds contributions."  Whyte's affidavits ("Whyte Aff.") is annexed to the Hanlon Declaration as Exhibit as 16.

- November 7, 2005.  Judgment was entered against the Judgment Debtor, KW Construction Inc. in the amount of $200,675.09.

- February 22, 2006.  Whyte, through a corporation he owns and controls named EMC of Tri State purchased real property located at 1700 Route 17M, Goshen, NY ("the Goshen Property") for $1,300,000.  Exhibit 17.

- September 12, 2007.  The Complaint in the instant action is filed.

- September 2007.  Upon information and belief, Whyte and Mahoney put the Goshen Property back on the market for sale, asking $999,999.00.  *See*, Affidavit of Matthew Davies, annexed to the Hanlon Declaration.

### Whyte's Fraud against the Funds

The Funds primarily rely on two types of documents to ensure that signatory employers are remitting the proper fringe benefit contributions pursuant to the terms of the CBA.  The first of these documents are the remittance reports created by the employers and submitted to the Funds.  The remittance reports show the hours that each carpenter performed covered work.  In addition to the remittance reports, the Funds receive shop steward reports that are filled out by a designated carpenter on the job site, i.e., the shop steward, and are signed by a representative of the employer.  Like the remittance reports, the shop steward reports contain – or are supposed to contain – the names of each carpenter who worked on a jobsite on each day for a given week, and that number of hours worked by that carpenter.  However, defendant Whyte regularly caused both the remittance reports and the shop steward reports to be falsified, such that they did not accurately reflect the number of carpenters on KW's jobsite, or the number of hours worked by those carpenters.

During the course of supplemental proceedings to enforce the 2005 Judgment, the Funds discovered the existence of bank accounts controlled by defendant Whyte which had until then been concealed from the Funds and their auditors (Polvere Aff. at ¶ 16), despite defendant

Whyte's sworn statement that he had provided them with "all records." *See* Exhibit 16. The records from these bank accounts revealed that the hours actually worked by carpenters in KW's employ was drastically under-reported on the remittance reports and shop steward reports that had been submitted. (Polvere Aff. at ¶¶ 10-14) It appears that Whyte was using his personal bank accounts and the accounts of other companies interchangeably with the accounts of KW, such that all of the companies involved could be considered alter egos of Whyte. However, even without taking into consideration the wages paid to carpenters out of Whyte's personal accounts and the accounts of other companies, the under-reporting of hours worked by KW's carpenters was substantial.

Forensic auditor Polvere analyzed the newly discovered evidence, which consisted of the records from twelve bank accounts, and some personal and business tax returns. Based on an analysis of the two accounts owned directly in the named of "KW Construction Inc.," Polvere discovered that off the books payments to over one hundred (100) carpenters, resulting in a benefit fund contribution deficiency of $1,114,185.18. (Polvere Aff. at ¶¶ 10-13) The wages paid from these bank accounts were for hours that were reported to the Funds, and for which the required fringe benefit contributions were not made – in violation of the explicit terms of the CBA. (Polvere Aff. at ¶ 12)

Indeed, carpenters who were victimized by this fraud have submitted sworn statements which shed light on the fraudulent scheme employed by Whyte to avoid making the required contributions. For instance, Bienvenido Rivera stated that he "worked for KW Construction in June 2003 at the Bronx High School of Law," where he was the designated shop steward. Rivera stated that "John Whyte, the owner, [kept] men off the [shop steward reports] and to work overtime for cash." Rivera stated that he worked weekends and nights "off the books" and was

paid a bribe by Whyte of $50.00 per each carpenter that he (Rivera) did not include in the shop

steward reports. Exhibit 18. The shop steward reports are a primary means that the Union has of

ensuring that the correct benefit fund remittances are being made. Whyte knew this, and by

bribing the shop steward to under-report men and hours, he purposefully defrauded the Union

and the plaintiff Funds.

John Whyte intentionally and willfully defrauded the Benefit Funds. The audit findings

that produced the 2005 Judgment were based on comparing benefit fund remittances to shop

steward reports. Shop steward reports serve as a means of independently verifying that a

signatory employer is reporting hours properly – that is, unless the employer bribes the shop

steward to falsify the report. The payroll flowing out of KW's off-the-books bank accounts did

not factor into the original payroll audit or the subsequent arbitration and eventual judgment.

The concealment of these KW operating accounts and the corresponding cash disbursements

journals from the benefit fund auditors was in furtherance of the scheme to defraud the Union

and its members. (Polvere Aff. at ¶ 15-17)

## ARGUMENT

### POINT I
### AN ORDER OF ATTACHMENT SHOULD BE GRANTED

Rule 64 of the Federal Rules of Civil Procedure empowers the federal district courts to

utilize state law procedures and remedies providing for the seizure of property to secure

satisfaction of a potential judgment. Rule 64 further explicitly lists attachment as an available

remedy in this regard. Thus, in the Southern District of New York, an application for an order of

attachment in is governed by Article 62 of the New York Civil Practice Law and Rules. Section

6201(3) of the CPLR provides that, "a party may obtain an order of attachment upon

demonstrating that (1) it has stated a claim for a money judgment; (2) it has a probability of success on the merits; (3) the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts; and (4) the amount demanded from the defendant is greater than the amount of all counterclaims known to the party seeking attachment." *JSC Foreign Economic Ass'n Technostroyexport v. International Development and Trade Services, Inc.*, 2006 WL 1206372, *1 (S.D.N.Y. 2006) (quoting NY CPLR § 6212(a), internal citations and quotations omitted).

**1.      Plaintiffs have stated a cause of action for a money judgment.**

Plaintiffs have clearly have viable cause of action for a money judgment against defendants KW Construction and John Whyte, its principal.  The cause of action against KW Construction is based on KW's failure to remit proper benefit fund contributions as required by the CBA.  Section 301 of the Labor Management Relations Act grants federal jurisdiction over suits to enforce collective bargaining agreement such at the one at issue in this case. Furthermore, Section 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145, mandates that employers make contributions as required by applicable collective bargaining agreements, and ERISA § 502, 29 U.S.C. § 1132, in turn establishes a cause of action for violations of § 515 and other parts of ERISA.

Plaintiffs also have a viable cause of action for a money judgment against defendant Whyte in his personal capacity.  Defendant Whyte's personal liability is based on two theories: (1) common law fraud and (2) Whyte's status as the alter ego of defendant KW.

It is well established that a corporate officer or director is personally liable for fraud where he or she had knowledge of the misrepresentation at issue.  *See, e.g., American Feeds and*

*Livestock Co., Inc. v. Kalfco, Inc.*, 149 A.D.2d 836, 837, 540 N.Y.S.2d 354, 355 (3d Dep't 1989) (citing Marine Midland Bank v. Russo, 50 N.Y.2d 31, 44, 427 N.Y.S.2d 961, 405 N.E.2d 205; 15 N.Y.Jur.2d, Business Relationships, § 1076, at 349-350; Santa Barbara v. Avallone & Miele, Inc., 270 N.Y. 1, 7, 199 N.E. 777). "In order to recover for fraud, plaintiffs must show a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." <u>Serino v. Lipper</u>, 846 N.Y.S.2d 138, 144 (1st Dept., 2007). Plaintiff's complaint filed in the instant action ("the Complaint") clearly states a claim for fraud such that defendant Whyte is personally liable for KW Construction's delinquency:

> at times between January 1, 2000 and June 30, 2005, Whyte, acting by himself and/or in concert with persons acting under his direction and control, engaged in a concerted and systematic scheme to defraud the Funds of contributions required to be paid on behalf of KW's carpenter employees by: (a) paying carpenters, or causing carpenters to be paid in cash and/or "off the books" for the purpose, *inter alia*, of avoiding the required fringe benefit fund contributions to the Funds; (b) submitting and/or communicating, or causing KW to submit and/or communicate, false reports and information to the Funds (or its agents) that deliberately omitted covered employees; and (c) other schemes and artifices presently unknown.

> Complaint at ¶ 22.

The complaint further alleges that Whyte (1) "[provided] reports and information to the Funds that deliberately omitted covered employees for whom contributions were required to be made," at ¶ 22, (2) "submitted shop steward reports to the District Council that deliberately omitted covered employees for whom they knew KW was required to make contributions to the Funds," at ¶ 23, (3) "knew the documents and reports of carpenters employed and the hours they worked were false when made," at ¶ 24, (4) "knew the Funds relied upon the representations of hours worked and carpenters employed that were made to the Funds and/or its agents in

calculating KW's liability for fringe benefit contributions," at ¶ 28, and that (5) "the Funds justifiably relied upon defendant Whyte's representations, and the records and hours reported by KW," at ¶ 29.  It is, of course, patently obvious that Whyte knew his representations were false when made, and that they were made with intent to defraud, considering that *he bribed shop stewards to keep the names of carpenters off the reports* that were submitted to the union.

Thus, the elements of fraud have been adequately pleaded: Whyte (1) made a representation of material fact (i.e., the number of hours worked by covered carpenters); (2) said representation was false; (3) Whyte knew the representation was false when he made it; (4) plaintiffs justifiably relied on the false representation in calculating KW's liability, and (5) plaintiffs injury resulted directly from their reliance on Whyte's false representations.  Defendant Whyte is personally liable for KW's breach of contract and ERISA fund delinquency.

However, even absent allegations supporting a common law fraud claim, defendant Whyte is personally liable for KW's breach and the resulting money damages.  A principal of a sole proprietorship is personally liable for the business's undertakings and obligations.  *See, e.g.*, *In re Golden Distributors, Ltd.*, 134 B.R. 766, 769 (Bkrtcy.S.D.N.Y.,1991) ("The designation 'd/b/a' means 'doing business as' but is merely descriptive of the person or corporation who does business under some other name. Doing business under another name does not create an entity from the person operating the business. The individual who does business as a sole proprietor under one or several names remains one person, personally liable for all his obligations.").

As alleged in the Complaint, "KW Construction Inc.," despite its name, was never properly incorporated, nor were any corporate formalities ever observed, as discussed below.

14

2.    **It is a certainty that Plaintiff will succeed on the merits.**

While the full scope of Whyte's fraud against the Funds will be revealed in the course of further discovery in the instant action, it is already sufficiently certain that plaintiffs will succeed on the merits.  Plaintiffs have already had the benefit of some discovery which was produced by third parties in the course of supplemental proceedings to enforce the 2005 judgment.  As a result, the ultimate liability of defendants KW Construction Inc. and John Whyte can be established now.  It is only the precise dollar figure of that liability that is not known with absolute certainty and may need to be adjusted (probably upward).

While mere allegations are not sufficient to support an application for an order of attachment, such an application may be granted so long as the evidentiary facts that support a prima facie case have "some probative force," *Swiss Bank Corp. v. Eatessami*, 26 A.D.2d 287, 290 (N.Y.A.D. 1966).  "While there must be a sufficient showing that the ultimate facts stated in the pleading can be substantiated, the truth of the facts stated may be assumed and plaintiff must be given the benefit of all legitimate inferences and deductions that can be made from the facts stated.  *Id.* (internal citations and quotations omitted).  Even without the benefit of this lenient standard, plaintiffs have offered evidentiary facts that are more than sufficient to make out a prima facie case, as demonstrated below.  These evidentiary facts include the Polvere Affidavit and the records it is based on, which irrefutably show that KW is delinquent in benefit fund contributions, and the Rivera Affidavit which provides direct evidence of defendant Whyte's fraudulent intent.

a.    **KW Construction is delinquent in benefit fund contributions**

It is sufficiently clear that KW is delinquent in benefit fund contributions.  This conclusion is based on solid ground – i.e., subpoenaed records produced by financial institutions

and the analysis of an independent expert.  However, even without the benefit of Mr. Polvere's expertise, it is clear from the subpoenaed records and sworn statements by carpenters that defendant Whyte paid carpenters off the books and did not remit the required contributions on their behalf to the Funds.  The Rivera Affidavit plainly demonstrates that Whyte bribed at least one shop steward to keep carpenters off the books, and the records of the secret KW accounts at Country Bank and Union Savings Bank reflect payments to over 100 carpenters.

### b.    Defendant KW's irrefutable delinquency is the result of defendant Whyte's fraud

The proof of Whyte's representations – and their falsity – is established through the attached exhibits and affidavits.  Whyte representations include (1) the remittance reports signed by Whyte, (2) the shop steward reports, (3) Whyte's sworn affidavit dated October 28, 2005. The falsity of these representations is demonstrated, respectively, by (1) the Polvere Affidavit demonstrating that there was significant payroll for covered work not included on the remittance reports, (2) the Rivera Affidavit demonstrating that Whyte bribed at least one shop steward to submit falsified reports to the Union, and (3) the Polvere Affidavit which demonstrates that the documents produced by Whyte during the course of the first audit did not constitute "all" of KW's records – rather, Whyte intentionally concealed KW's secret bank accounts that were used for off the books payroll.

It is undeniable that Whyte knew these representations were false when he made them.  It is also clear that the Funds justifiably relied on these statements when calculating the contributions owed by KW.  The Funds relied on the falsified remittance reports when they calculated what contributions were owed in the first instance, they relied on the falsified shop steward reports when they conducted the first audit, and they relied on Whyte's sworn affidavit

that all records had been produced when they settled the 2005 action. This reliance on Whyte's false statements was the direct cause of Plaintiffs injuries.

**c.      Whyte is the Alter Ego of defendant KW Construction**

Defendant Whyte is personally liable for defendant KW's benefit fund contribution delinquency without regard to plaintiffs' fraud claim because he is KW's alter ego. Upon information and belief, KW was never formally incorporated, nor was it ever operated as a corporation.

New York courts "will disregard the corporate form, or, to use accepted terminology, pierce the corporate veil, whenever necessary to prevent fraud or to achieve equity." *Careccia v. Macrae,* 2005 WL 1711156, *2 (E.D.N.Y. 2005) (internal quotation marks and citations omitted). Generally, "piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Id.* (internal citations omitted).

In order to determine whether a corporation is dominated, courts consider a number of factors: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) the amount of discretion showed by the allegedly dominated corporation; (5) common address; (6) whether the alleged dominator deals with the corporation at arms length; (7) whether the corporation is treated as an independent profit center; (8) whether others pay or guarantee debts of the dominated corporation; and (9) intermingling of property between the alleged dominator and the corporation. *Id.* at *3 (internal citations omitted).

Despite the fact that Whyte fraudulently holds out "KW Construction Inc." to be a New York State corporation (*see, e.g.,* forms completed by Whyte and filed with the Union, annexed

to the Hanlon Declaration as Exhibit 15), a search of the New York State Department of State Division of Corporations database reveals that no such entity has ever been incorporated in the state of New York.[5] (Hanlon Decl. at ¶ 21)

Not only was KW never formally incorporated, but corporate formalities were never observed in the slightest degree. The bank records produced pursuant to Article 52 subpoenas, as summarized in the Polvere Affidavit, demonstrate that Whyte dominated KW in that he was able to direct its business receivables into his and his wife's personal bank accounts and was able to use corporate funds to pay for his personal expenses including such things as (1) his residential mortgage, (2) personal credit card bills, (3) residential utilities and cable television bills. (Polvere Aff. at ¶¶ 19-23) Said activities also constitute the co-mingling of "corporate" and personal funds, and the domination of KW by defendant Whyte. KW Construction was not treated as an independent profit center, but was merely a tool for the enrichment of its sole principal, John Whyte.

3.    **Grounds for attachment exist based on Defendants' past and present fraudulent conduct.**

John Whyte has a long history of assigning, encumbering, and secreting assets in order to frustrate the collection of debts and the enforcement of judgments by the plaintiff Funds. As detailed on the timeline above, Whyte began a process of transferring and assigning away his assets for little or no consideration beginning shortly after he was served with the results of the 2003 payroll audit, and continuing through the arbitration proceedings, the subsequent

---

[5] While a Westlaw search of databases in all 50 states reveals that there are a number of corporations named "KW Construction Inc.," in Oklahoma, Louisiana, Delaware, Washington State, Illinois, and North Carolina, there is no information in these documents that suggest any of these entities are connected to the defendants in this case. *See,* Westlaw document numbers OK1900544366; 62692994568; 16132311655; 3688993013; 30600511335; 18954330630; 47376789124; and 39586094572.

confirmation litigation, and during the supplemental proceedings to enforce the resultant 2005

Judgment – which judgment remains unsatisfied as a result of Whyte's evasions.

Pursuant to the terms of NY CPLR § 6201(3), an order of attachment may be granted "...

when ... the defendant, with intent to defraud his creditors or frustrate the enforcement of a

judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or

secreted property, or removed it from the state or is about to do any of these acts." NY C.P.L.R.

§ 6201(3). New York courts further require a party seeking an attachment order to show that (1)

it has stated a claim for a money judgment; (2) it has a probability of success on the merits; (3)

the amount demanded from the defendant is greater than the amount of all counterclaims known

to the party seeking attachment. The plaintiff must establish "(i) that the defendant either is

about to or has assigned, disposed of, encumbered or secreted property, or removed it from the

state, and (ii) that the defendant has acted or will act with the intent to defraud his or her

creditors, or to frustrate the enforcement of a judgment that might be rendered in plaintiff's

favor." *Allstate Ins. Co. v. TMR Medicbill Inc.* 2000 WL 34011895, 13 (E.D.N.Y.,2000) (citing

*Bank Leumi Trust Co. of New York v. Istim, Inc.,* 892 F. Supp. 478, 482 (SDNY 1995).

It is well established that circumstantial evidence of fraudulent intent is sufficient to

warrant the issuance of an attachment order. Indeed, it has often been observed in this context

that direct evidence of fraudulent intent is rare and hard to come by. *Bank Leumi,* 892 F.Supp.

478, 483 (SDNY 1995) (noting that "[i]t is not always practicable to establish by proof the

existence of a fraudulent intent ... even when in reality it exists. Direct proof of the fact can

rarely be obtained, and when it is established it must ordinarily be inferred from the

circumstances."); *JSC Foreign Economic Ass'n Technostroyexport v. International Development

and Trade Services, Inc.,* 306 F.Supp.2d 482, 487-88 (S.D.N.Y. 2004) ("Because direct evidence

of an intent to defraud or to frustrate the enforcement of a judgment is rare, the intent required under C.P.L.R. § 6201(3) is usually inferred from the circumstances.") For instance, in *JSC Foreign Economic Ass'n Technostroyexport v. International Development and Trade Services, Inc.,* this court found that evidence concerning "[t]he circumstances of Reich's [the defendant] conduct, as documented in the record before the Court, amply support a finding that Reich has acted with actual intent to frustrate the enforcement of a judgment against her." The evidence in question "established that after restraining notices had been issued against her, Reich had shifted over a million dollars into a Merrill Lynch account in an associate's name, but under Reich's control, and that Reich had deposited funds in other accounts as well." (Id. at 41-44.) *JSC Foreign Economic Ass'n Technostroyexport v. International Development and Trade Services, Inc.,* 2006 WL 1206372, 1 (SDNY, 2006).

The transfer or disappearance of an abnormal amount of property will suffice for the disposal of assets prong of the analysis. *Id.* While an attempt to dispose of assets, standing alone, does not conclusively demonstrate intent to defraud, "the intent to avoid or frustrate judgment can be inferred from the timing of the dissolution and its systematic nature. *Id.* (citing *Bank Leumi,* 892 F.Supp. at 483, 486, and *City of New York v. Citisource, Inc.,* 679 F.Supp. 393, 397 (S.D.N.Y.1988)).

The Funds have offered evidence of "actual ... transfers or dispositions of assets that would frustrate a judgment in favor of" plaintiffs. *Allstate Ins. Co. v. TMR Medicbill Inc.* 2000 WL 34011895, 13. Furthermore, the systematic nature of Whyte's disposal of his assets, combined with the frequency, timing and circumstances surrounding these transfers clearly indicate that they were undertaken with fraudulent intent.

As detailed in the timeline *supra.*, defendant Whyte began transferring assets in response to the Funds attempts to inquire into his payroll records and to collect delinquencies. The timeline and circumstances surrounding the numerous asset transfers engaged in by Whyte – including the fact that many of the transfers were for nominal or no consideration, and that Whyte retained control over many of these assets even after he transferred them – leave little room doubt regarding Whyte's fraudulent intent.

**4.    The amount demanded from the defendants exceeds all counterclaims known to plaintiffs.**

Defendants have no known counterclaims against Plaintiffs.

**CONCLUSION**

For the forgoing reasons, plaintiffs' motion for an order of attachment and for a temporary restraining order should be granted.

Dated:    New York, New York
          January 25, 2008


Respectfully submitted,

O'DWYER & BERNSTIEN, LLP


By: NICHOLAS HANLON (NH 0001)
Attorneys for Plaintiffs
52 Duane Street, 5th Floor
New York, New York 10007
(212) 571-7100