UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THE NEW YORK DISTRICT COUNCIL OF
CARPENTERS PENSION FUND, NEW YORK CITY
DISTRICT COUNCIL OF CARPENTERS WELFARE
FUND, NEW YORK CITY DISTRICT COUNCIL OF
CARPENTERS VACATION FUND, NEW YORK
CITY DISTRICT COUNCIL OF CARPENTERS
ANNUITY FUND, NEW YORK CITY DISTRICT
COUNCIL OF CARPENTERS APPRENTICESHIP,
JOURNEYMAN RETRAINING, EDUCATIONAL
AND INDUSTRY FUND, NEW YORK CITY
DISTRICT COUNCIL OF CARPENTERS CHARITY      07-CV-08008 (RJS)
FUND, by their Trustees Michael J. Forde and Paul
O'Brien, and NEW YORK CITY AND VICINITY
CARPENTERS LABOR-MANAGEMENT
CORPORATION,

                                    Plaintiffs,

        -against-

KW CONSTRUCTION INC., as Successor to K W
GENERAL CONTRACTOR, INC. and JOHN WHYTE
d/b/a KW CONSTRUCTION, INC., and JOHN
WHYTE, individually,

                                    Defendants.
-------------------------------------------------------------X


# MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER OF ATTACHMENT

Nicholas Hanlon
O'Dwyer & Bernstien, LLP
52 Duane Street
New York, New York  10007
(212) 571-7100
Attorneys for Plaintiffs                                May 2, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
THE NEW YORK DISTRICT COUNCIL OF
CARPENTERS PENSION FUND, NEW YORK CITY
DISTRICT COUNCIL OF CARPENTERS WELFARE
FUND, NEW YORK CITY DISTRICT COUNCIL OF
CARPENTERS VACATION FUND, NEW YORK
CITY DISTRICT COUNCIL OF CARPENTERS
ANNUITY FUND, NEW YORK CITY DISTRICT
COUNCIL OF CARPENTERS APPRENTICESHIP,
JOURNEYMAN RETRAINING, EDUCATIONAL
AND INDUSTRY FUND, NEW YORK CITY
DISTRICT COUNCIL OF CARPENTERS CHARITY       07-CV-08008 (RJS)
FUND, by their Trustees Michael J. Forde and Paul
O'Brien, and NEW YORK CITY AND VICINITY
CARPENTERS LABOR-MANAGEMENT
CORPORATION,

                            Plaintiffs,

   -against-

KW CONSTRUCTION INC., as Successor to K W
GENERAL CONTRACTOR, INC. and JOHN WHYTE
d/b/a KW CONSTRUCTION, INC., and JOHN
WHYTE, individually,

                            Defendants.
-----------------------------------------------------------------X

      This memorandum is submitted on behalf of plaintiffs in response to defendants' Sur-reply Memorandum of Law in Opposition to Plaintiffs' Motion for an Order of Attachment. This response and defendants' sur-reply are submitted pursuant to the Courts oral order at the hearing in this matter held on March, 28, 2008. Plaintiffs further submit herewith an Exhibit Supplement containing the declarations of Daniel Ryan, Aaron Gholston, and Phil Giudice, and six exhibits in support of this motion.

## PRELIMINARY STATEMENT

The parties have been involved in an audit, arbitration, and litigation since 2003. At no point has defendant KW Construction contested the fact that it was bound to the 2001 Agreement. KW permitted the Funds to audit its books in records in 2003, and participated in the arbitration hearings that resulted for that audit in 2004. KW further participated in litigation that was commenced to confirm the arbitration award. In settlement of that litigation, John Whyte executed an affidavit dated October 28, 2005, stating, *inter alia*, "KW is signatory to a collective bargaining agreement with the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America." A copy of this affidavit is annexed to the Hanlon Declaration as Exhibit 16.

If plaintiffs had believed that the existence of a collective bargaining agreement was in dispute, they would have addressed that issue more thoroughly in their original motion papers. It is plaintiffs' contention that the defendants have waived their opportunity to deny the existence of a collective bargaining agreement and the corresponding obligation to make contribution to plaintiff Funds on behalf of their employees. Indeed, defendants have explicitly admitted to the existence and enforceability of the collective bargaining agreement.

Nonetheless, the below argument demonstrates the existence of a collective bargaining agreement even absent defendants' waivers and admission.

## ARGUMENT

### I.  Defendant KW Construction was obligated to contribute to the Funds pursuant to a collective bargaining agreement.

In order to make sense of both the defendants' arguments that there was no collective bargaining agreement between KW and the District Council after June 30, 2001, and plaintiffs' argument that there was a collective bargaining agreement through at least June 30, 2005, it is helpful to review the process by which the District Council negotiates its agreements with employers, and to become familiar with the jargon of multi-employer pattern bargaining in the construction industry. It is also important to take note of the principle that collective bargaining agreements are not ordinary contracts, and ordinary principles of contract law do not always apply in the labor relations context. As the Supreme Court observed over forty years ago, "a collective bargaining agreement is not an ordinary contract," nor is it in "any real sense the simple product of a consensual relationship." John Wiley & Sons v. Livingston, 376 U.S. 543, 550 (1964). Rather, a collective bargaining agreement must be interpreted with regard to the custom and practice between the parties to the agreement, as such an agreement "calls into being a new common law – the common law of a particular industry or of a particular plant." Id. (internal quotations and citations omitted); see also, Operating Engineers Local 139 Health Benefit Fund v. Gustafson Const. Corp., 258 F.3d 645, 649 (7th Cir. 2001) (Posner, J.) (observing that "the common law that the federal courts have devised to govern disputes arising out of collective bargaining contracts and ERISA plans does not coincide at every point with the general law").

3

## Association Agreements and Independent Agreements

The District Council has two types of collective bargaining agreements: those with multi-employer associations, and those with independent employers who are not members of any association. (Giudice Decl., ¶ 2) The District Council negotiates its collective bargaining agreements with the multi-employer associations. (Giudice Decl., ¶ 4) These agreements set the terms and conditions of employment for union carpenters in New York City, and they are binding on the members of the multi-employer associations. Id. Independent employers who are not members of any association may become signatory to a collective bargaining agreement with the District Council by signing what is known as an "independent agreement." (Giudice Decl., ¶ 7) The independent agreements are based on and derived from the association agreements, with only very minor differences. (Giudice Decl., ¶ 8) For instance, the "Independent Building Construction Agreement," to which KW was signatory,[1] is based on the District Council's agreements with the Association of Wall, Ceiling, and Carpentry Industries of New York and the Building Contractors Association. Id. The applicable wage and fringe benefit fund contribution rates in these two association agreements are identical. Id.

There is no difference whatsoever between an independent agreement and the association agreement(s) that it is based on with regard to wage and fringe benefit fund contribution rates. Id. For instance, the wage and fringe benefit fund contribution rates required by the District Council's agreement with the Association of Wall, Ceiling, and Carpentry Industries of New York are exactly the same as the rates required by the Independent Building Construction Agreement. Id. Indeed, the District Council only

---

[1] KW admits that it was signatory to the 1996 – 2001 Independent Building Construction Agreement. It now argues only that it never became signatory to the successor to that agreement, the 2001-2005 Independent Building Construction Agreement.

4

publishes one wage and benefit schedule for both agreements. That is, the same document indicates the wage rate and the fringe benefit fund contribution rate throughout the life of the five-year contracts for the Independent Building Construction Agreement and for the agreement with the Association of Wall, Ceiling, and Carpentry Industries of New York. (Giudice Decl., ¶ 10. A copy of this Wage and Benefits Schedule is included in the Exhibit Supplement as Exhibit 22).

An independent employer – like KW – who desires to avail itself of the benefits of a union contract will sign the independent agreement that is based on the association agreement negotiated by the multi-employer association whose members perform similar work to the work performed by the independent employer. (Giudice Decl., ¶ 11) For instance, an independent employer who does wall and ceiling construction (e.g., sheetrock framing) will sign the Independent Building Construction Agreement, which is based on the agreement negotiated by the Association of Wall, Ceiling, and Carpentry Industries of New York. Id.

This process is known as "pattern bargaining," and it is commonplace in the unionized construction industry. This fact was noted by Judge Sweet in Seabury Const. Corp. v. District Council, 461 F.Supp.2d 193, 197 (S.D.N.Y. 2006):

> [t]he construction industry typically engages in what is known as 'pattern bargaining.' The District Court for the District of South Dakota succinctly summarized this process and the policies behind it in John Morrell & Co. v. United Food and Commercial Workers Int'l Union, 825 F.Supp. 1440, 1443 (D.S.D.1993): 'UFCW and the meat-packing employers (including Morrell) engaged in what is commonly known as "pattern bargaining." In each round of negotiations, one meatpacking company and UFCW would reach an agreement which would "set the pattern" for the meat-packing industry, and the other companies would then adopt the same provisions as a means of equalizing labor costs. This pattern bargaining resulted in the same wages and benefits and working conditions for all employees and retirees in the meat-packing industry.'

5

As the above quoted language makes clear, a key purpose of pattern bargaining is to equalize labor costs. Independent employers like KW adopt the term and conditions of employment negotiated by the multi-employer associations in order receive the many benefits of a union contract, and so that they may pay the same amount for wages and benefits as every other union contractor.

While an independent employer is, by definition, not a member of any employer association, the independent agreements nonetheless require the independent employer to contribute to a "promotional fund" which supports the activities of the association whose members perform similar work to that performed by the independent employer. (Giudice Decl., ¶ 12) The Independent Building Construction Agreement for 2001 – 2006 annexed to the Hanlon Declaration as Exhibit 1, includes this requirement in Article XVIII. For instance, an independent employer who performs wall and ceiling construction, such as sheetrock framing, must contribute to the promotional fund for the Association of Wall, Ceiling, and Carpentry Industries of New York, which is named the "Drywall Industry Promotional Fund of New York." (Giudice Decl., ¶ 12)

In compliance with this requirement KW executed an agreement to make contributions to the Drywall Industry Promotional Fund of New York, since this is the promotional fund of the association whose members perform similar work to that performed by the independent employer, i.e., Association of Wall, Ceiling, and Carpentry Industries of New York. A copy of this agreement, signed by John Whyte, is included in the Exhibit Supplement as Exhibit 23. (Giudice Decl., ¶ 13).

## The Interim Compliance Agreement

The collective bargaining agreements for the five year period of 1996 to 2001 expired by their own terms on June 30, 2001. Just prior to this expiration date, while the District Council was in negotiations with the various multi-employer associations, the District Council asked independent employers to sign a contract called the "Interim Compliance Agreement," if they wanted to maintain their status as union contractors, and avail themselves of the benefits of a collective bargaining agreement with the District Council for another five year period. A copy of the Interim Compliance Agreement executed by KW is annexed to the Hanlon Declaration as Exhibit 3. The same Interim Compliance Agreement was sent to every independent employer, and the language of the Interim Compliance Agreement was drafted so as to be broad enough to cover all the independent employers, regardless of which multi-employer association contract their contract was based on. The validity and enforceability of this Interim Compliance Agreement was affirmed by Judge Sweet in Seabury Const. Corp. v. District Council, 461 F.Supp.2d 193 (S.D.N.Y. 2006).

The Interim Compliance Agreement provided that the current independent agreements (i.e., the 1996 – 2001 agreements) would continue in full force and effect until the District Council and the association whose contract the independent employer's contract was based on completed negotiations for a successor agreement. (Interim Compliance Agreement, Art. I) At that point, the Interim Compliance Agreement provided that the new agreement would become binding on the independent employer

7

retroactive to July 1, 2001 (Article II) regardless of whether or not it actually executed the successor agreement (Article III).

At the hearing held on March 28, 2008, the Employer attacked the validity of the Interim Compliance Agreement, a copy of which is annexed to the Hanlon Declaration as Exhibit 3. One of the arguments put forward by the Employer was that the Interim Compliance Agreement, by its terms, does not bind KW to the Independent Building Construction Agreement (which was the agreement submitted into evidence by plaintiffs as proof of KW's obligation to make contributions to the Funds, and is annexed to the Hanlon Declaration as Exhibit 1). Rather, defendants argue, the Interim Compliance Agreement binds KW to the association agreement negotiated by the multi-employer association whose members perform similar work to KW. As discussed below, the multi-employer association whose members perform similar work to that performed by KW is the Association of Wall, Ceiling, and Carpentry Industries of New York (the "Wall Ceiling Association"). Thus, as KW would have it, it is not bound to contribute to the Funds pursuant to the terms of the 2001 Independent Building Construction Agreement, but pursuant to the agreement with the Wall Ceiling Association (the "Wall Ceiling Agreement," a copy of which is included in the Exhibit Supplement as Exhibit 24).

This argument is the very definition of a red herring, as the fringe benefit fund contribution rates contained in the Independent Building Construction Agreement are identical to those in the Wall Ceiling Agreement. (Giudice Declaration, ¶ 10). This is because the Independent Building Construction Agreement is derived from the Wall Ceiling Agreement. (Giudice Declaration, ¶ 8) The only difference is that the Wall

8

Ceiling Agreement is for association members and the Independent Building Construction Agreement is for independent employers.

### A. KW adopted and ratified the 2001 Independent Building Construction Agreement by its conduct as it complied with that agreement over the course of five years.

Even if the Interim Compliance Agreement was invalid to bind KW to the successor agreement for 2001 – 2006, KW adopted and ratified the successor agreement through its subsequent conduct.

As Judge Sweet noted in Seabury, "[a] CBA does not have to be signed by the employer to be effective" and "[a]n employer's intent to adopt an agreement may be evidenced by its conduct of complying with some of its terms. Seabury Const. Corp. v. District Council, 461 F.Supp.2d 193, 198 (S.D.N.Y. 2006) (citing Brown v. C. Volante Corp., 194 F.3d 351, 354-55 (2d Cir.1999) for the proposition that an employer's intent to adopt CBA that it had not signed was established by filing of 61 benefit fund contribution remittance reports in accordance with terms of agreement); see also, Robbins v. Lynch, 836 F.2d 330, 332 (7th Cir.1988) (granting summary judgment to trustee of funds on the basis that an employer had adopted an agreement; noting, among other things, that the employer "paid the union scale...and paid (some) pension and welfare contributions"); Trustees of Atlanta Iron Workers, Local 387 Pension Fund v. Southern Stress Wire Corp., 724 F.2d 1458, 1459-60 (11th Cir.1983) (per curiam) (upholding finding that employer adopted a collective bargaining agreement; noting employer's payment of union wages, submission of benefit reports, and accession to audit).

In Seabury, as here, an employer who had signed the Interim Compliance Agreement had failed to sign the successor independent agreement (in that case, the

9

successor independent agreement was the Independent Millwright Agreement, which is based on the District Council's agreement with the Millwright Association). The court found that even without the Interim Compliance Agreement, the employer had adopted and ratified the 2001 – 2006 agreement through its conduct. The court held that "when [the employer] proceeded to avail itself of that Agreement over the next five years, and was awarded contracts that require union labor and union-sponsored apprenticeship programs, [it[ was bound under the contract."

The court found that the employer "availed itself of the benefits and complied with the terms of the 2001 agreement." This was evidenced by the fact that the employer had requested carpenters from the District Council's Out-of-Work list, and because the employer had made contributions to the District Council's affiliated benefit funds over a period of years. Not only had the employer in Seabury made contributions to the Funds based on the hours it reported, it had "paid the higher rates required under the 2001 Agreement and complied with the five increases that were required at various intervals over a five year period." See also, *Local 32BJ v. Coby Grand Concourse, LLC*, 2006 WL 692000, at *4 (S.D.N.Y.2006) (finding that an employer had adopted an agreement despite expressly refusing to sign it because it "not only continued to pay Union workers at the prevailing wage and make contributions to both health and pension funds at the prevailing rates specified in the CBA, but paid wage and fund contribution rate increases in accordance with the very schedule specified in the CBA.")

The court further found that the employer had adopted the successor agreement because, "Furthermore, during the relevant time period (July 1, 2001 to the present), [the

10

employer] has permitted the District Council to audit its books and records on three separate occasions, in compliance ... the 2001 Agreement."

KW's conduct since July 2001 evidences that it adopted the 2001 Agreement, as it has availed itself of the benefits and complied with the terms of that Agreement. KW availed itself of the benefits of its relationship with the Union by requesting carpenters from the District Council's Out of Work List (the "O.W.L."). For instance, Dispatch Notices show that the District Council dispatched carpenters to KW for at least 115 times between July 1, 2005 and January 25, 2005. (See Exhibit 21, and the Gholston Decl.) As in Brown and Seabury, where the employer was found to have adopted a collective bargaining agreement because it contributed to the union's benefit fund over a period of years, KW has consistently made the proper contributions to the various fringe benefit funds as required under the Agreement since 2001.[2] (See, Ryan Declaration, ¶¶ 3 and 4, and the Employer Contributions Inquiry and Benefit Funds Spreadsheet, included in the Exhibit Supplement as Exhibits 19 and 20, respectively). This course of conduct clearly demonstrates that KW was obligated under the Agreement. Indeed, if KW were not a signatory to the Agreement, then its contributions to the Funds were illegal, and they expose John Whyte, as KW's principal, to criminal liability. The Labor-Management Relations Act prohibits an employer from contributing to a union's ERISA trust fund unless done pursuant a valid written agreement, and provides that a violation of this rule is a felony, punishable by up to $15,000 in fines, and imprisonment for up to five years. See LMRA § 302(c) and (d), 29 U.S.C. § 186(c)(5)(B) and § 186(d).

---

[2] That is, KW remitted the proper *rate* for the hours it reported. Obviously, if KW had actually remitted the proper amount, this action would not have been initiated.

11

Like the employer in <u>Seabury</u> and in <u>Operating Engineers Local 139</u>, who was found to have adopted a successor agreement because it paid the higher benefit rates that were required by that agreement, KW paid the higher rates required under the 2001 Agreement. In fact, it complied with the five increases that were required at various intervals over a five year period. (Ryan Declaration, ¶¶ 3 and 4). While the fact that KW has been making contributions to the Benefit Funds since 2001 demonstrates that it is party to a collective bargaining agreement with the Union, the rate of contributions made by KW demonstrates that it is operating under and abiding by the 2001 Agreement, rather than one of its predecessors. That is, the rate of contributions increased at various intervals under the 2001 Agreement, and KW's contributions increased properly at each interval.

Furthermore, during the relevant time period (July 1, 2001 to the present), KW has permitted the Union to audit its books and records on more than one occasion, in compliance with the terms of the 2001 Agreement. See the Arbitration Award, annexed as Exhibit 4 to the Hanlon Declaration. When one of these audits revealed significant delinquencies through and including 2003, KW further ratified the agreement by participating in the contractual arbitration process. KW did not object to the jurisdiction of the arbitrator. Rather, John Whyte, on behalf of KW, appeared at six arbitration hearings over the course of four months, each time promising to produce relevant documents, before eventually defaulting. (Exhibit 4).

### B. KW agreed to be bound to the 2001 Independent Building Construction Agreement when it signed the Interim Compliance Agreement.

The validity and enforceability of the exact same Interim Compliance Agreement which KW admits that it executed was affirmed by Judge Sweet in <u>Seabury</u>. As stated above, any argument that Interim Compliance Agreement binds KW to the Wall Ceiling Agreement (included in the Exhibit Supplement as Exhibit 24) rather than to the Independent Building Construction Agreement is a red herring, since these to agreements are, in a sense, the same agreement, and since they contain identical provisions regarding wages and fringe benefit fund contribution rates. (Giudice Declaration, ¶ 10). Indeed, there is only one Wage and Benefit Schedule published for the two agreements. <u>Id.</u> A copy of that schedule is included in the Exhibit Supplement as Exhibit 22.

The Interim Compliance Agreement contains broadly drafted language because it was drafted for all of the independent employers with whom the District Council has collective bargaining relationships. Defendants now argue that the Interim Compliance Agreement is too vague, because it does not specifically state the name of the multi-employer association "whose members perform similar work to the work performed by this firm." A similar argument was made by the employer in <u>Seabury</u>, and it was rejected.

KW knew precisely what it was agreeing to when it executed the Interim Compliance Agreement. It was signing up to avail itself of the benefits of a union contract for another five years – not the least of which includes being awarded contracts that require union labor or union sponsored apprenticeship programs, such as public works/prevailing wage projects. And it was signing up to pay the same amount in wages

and benefits as contractors who did similar work and who were members of the Wall and Ceiling Association.

The fact that the Wall and Ceiling association is the multi-employer association "whose members perform similar work to the work performed by" KW is evidenced by the fact that (1) KW was signatory to the 1996 Independent Building Construction Agreement which is for employers who do the type of work performed by members of the Wall and Ceiling Association (Giudice Declaration, ¶ 11), and (2) because KW signed an agreement obligating it to contribute to the promotional fund that supports the activities of the Wall and Ceiling Association. (Exhibit 23, Giudice Declaration, ¶¶ 12 and 13).

II. **A general order of attachment against the Defendants' undifferentiated property should issue, without excluding any specific properties.**

The CPLR clearly contemplates that an order of attachment may simply state that it is attaching a defendant's general "property" up to a certain dollar amount.

Sections 6219 and 6220 provide mechanisms for discovering the existence of a defendant's property. Section 6219 provides that a plaintiff who has obtained an order of attachment may serve that order on a garnishee. This requires the garnishee to serve upon the sheriff a statement detailing the debts that the garnishee owes to defendants, and any property of defendants in possession of the garnishee. Section 6220 provides that a court may order disclosure "by any person of information regarding any property in which the defendant has an interest, or any debts owing the defendant." Crucially, both of these sections are only applicable *after* an order of attachment has issued. As such, the

CPLR clearly contemplates that an order of attachment may issue without specifying what property is attached.

In cases where attached property has multiple owners, including owners who are not defendants or subject to the attachment order, CPLR § 6221 provides for a proceeding "to determine adverse claims." Clearly, an order of attachment may issue against property that is not solely owned by the defendants.

Defendants' argument that a sheriff may be confused by a general order of attachment and might run amok attaching real properties that are not titled in defendants' names is ludicrous. Besides the obvious fact that a sheriff would be reluctant to attach property that is neither specified in an order of attachment nor titled in the name of the defendants, it is not the order of attachment that specifies the real property is to be levied upon. Rather, pursuant to CPLR § 6216, a levy upon real property is affected by providing the sheriff with a "notice of attachment indorsed with the name and address of the plaintiff's attorney and stating the names of the parties to the action, the amount specified in the order of attachment and a description of the property levied upon." Furthermore, this sections directs the sheriff to only levy upon an "interest of the defendant in real property." If the defendant has no interest in a real property, it may not be levied against.

Further disclosure may reveal that the properties which defendants do in fact have an interest in the properties that they want to be excluded from any attachment order. As such, plaintiffs' request that no specific properties be excluded, should the Court decided to issue an order of attachment.

### III. Defendants have not demonstrated that $50,000 is not an appropriate undertaking.

Since the actual damages to defendants that would result from a wrongfully-issued order of attachment are solely within their own knowledge or expertise, plaintiff's suggested undertaking of $50,000 must be accepted unless defendants can show that another amount is more appropriate.

Defendants state that "[t]he amount of the undertaking is required in most courts to be 10% of the estimated value of the property to be attached." While plaintiffs seek to attach up to $1,114,185.18, there is nothing to indicate that defendants have properties of this value.

The defendants complain that an order of attachment would severely damage them financially by interfering with their attempt to dispose of the Goshen Property. As stated above, the Goshen Property could only be attached if it did in fact belong to defendants. However, since this is defendants main concern, it may serve as a metric for determining the appropriate undertaking amount. The property was purchased for $1,300,000 (see Exhibit 17 annexed to the Hanlon Declaration), and it now on the market with a listing price of $999,999.00 (see Davies Affidavit, annexed to the Hanlon Declaration). In his declaration submitted in opposition to this motion, John Whyte states, under penalty of perjury, that there is a $500,000 mortgage on the property. Thus, the equity remaining in the property is approximately $400,000. Thus, a $50,000 undertaking exceeds the 10% figure that defendants contend is appropriate.

### IV. Defendants have admitted that they have a present intention to liquidate the Goshen Property.

While the Goshen Property is titled in the name of a corporation named "EMC of Tri-State," Whyte has admitted that he controls this corporation, and that he is attempting to sell the property. Whyte claims in his declaration submitted in opposition to this motion that "[p]art of the reason I am attempting to sell this property is to pay the mortgage on the property, and, if they is a surplus, pay the Funds." However, given Whyte's history of evasion, plaintiffs are not confident that they will see any of the proceeds from the sale of this property. While EMC of Tri-State is not a defendant in this action, such that real property titled in its name is not subject to attachment or execution *at this time*, Whyte interest in EMC of Tri-State is clearly subject to attachment. The proceeds of the Goshen Property may constitute the only funds that plaintiffs will ever be able to recover from defendants. As such, Whyte's admitted intention to liquidate the property presents a real and imminent threat

However, the wording of the CPLR clearly does not require an imminent threat of transfer as grounds for an order of attachment. In fact, Section 6201(c) clearly states that a past transfer of property with fraudulent intent, which plaintiffs have already demonstrated, is sufficient grounds for an order of attachment:

> the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, *has assigned,* disposed of, encumbered or secreted property, or removed it from the state *or* is about to do any of these acts.

17

## CONCLUSION

For the forgoing reasons, plaintiffs' motion for an order of attachment should be granted.

Dated:   New York, New York
         May 2, 2008

                                           Respectfully submitted,

                                           O'DWYER & BERNSTIEN, LLP

                                           By: NICHOLAS HANLON (NH0001)
                                           Attorneys for Plaintiffs
                                           52 Duane Street, 5th Floor
                                           New York, New York 10007
                                           (212) 571-7100